## McHIE *v*. McHIE.

[No. 15,928. Filed October 25, 1938. Rehearing denied November 28, 1938. Transfer denied January 30, 1939.]

*James S. McCarthy* and *Felix M. Buoscio,* for appellant.

*J. E. Darlington, Walter Myers, F. C. Crumpacker,* and *E. H. Friedrich,* for appellee.

WOOD, J.—The appellee brought suit against the appellant for an absolute divorce on the ground of cruel and inhuman treatment. Appellee filed an amended complaint in one paragraph. Appellant's motion to make this paragraph of complaint more specific and her demurrer thereto for insufficiency of facts were both overruled. Appellant then filed an answer in three paragraphs. The first paragraph, even though it takes up five pages of appellant's brief, is designated by her counsel as a general denial. The second and third paragraphs of answer did not allege affirmative facts, but were in the nature of legal arguments. Appellee filed a separate demurrer to the second and third paragraphs of answer for failure of facts sufficient to state a defense to appellee's cause of action as alleged in his amended complaint. These demurrers were sustained. The cause was tried upon the amended paragraph of complaint and the first paragraph of answer thereto. Upon request, the court found the facts specially and stated its conclusions of law thereon. These were in favor of appellee, and judgment was rendered in accordance therewith, awarding appellee an absolute divorce from appellant and adjusting property rights between the parties. The appellant filed a motion for a new trial which was overruled, and she appeals.

Appellant has assigned thirty-nine separate specifications of error for reversal of the judgment from which

she appeals. In her motion for a new trial she has alleged ninety causes therefor. In his answer brief, appellee has called our attention to certain omissions in the preparation of the transcript and failure of the appellant to comply in several details with the rules of this court in the preparation of her brief. The omissions in the preparation of the transcript which appellee has pointed out have, by leave of this court, been supplied since the filing of appellee's brief. The several alleged defects in the preparation of appellant's brief will be noticed and disposed of as we proceed with this opinion. Many of the specifications of error for reversal, set out in appellant's assignment of error, have been waived because of failure to discuss them in her brief, while some of those discussed are not proper assignments of error for reversal. The same criticisms apply equally to many of appellant's alleged causes for a new trial. For the purpose, therefore, of determining what questions are properly presented for consideration by the assignment of errors, we have examined the record, and, by a process of elimination, have determined that the following specifications of error were proper and require consideration, unless waived by appellant, namely: number one, error of the court in overruling appellant's motion to make appellee's amended complaint more specific; number two, error of the court in overruling appellant's demurrer to appellee's amended complaint; number three, error of the court in sustaining appellee's demurrer to appellant's second paragraph of answer; number four, error of the court in sustaining appellee's demurrer to appellant's third paragraph of answer; number twenty-one, error of the court in its conclusion of law number one; number twenty-two, error of the court in its conclusion of law number two; number twenty-three, error of the court in its conclusion of law number three; number twenty-four, error of the

court in its conclusion of law number four; number twenty-five, error of the court in its conclusion of law number five; number thirty-six, error of the court in overruling appellant's motion for a new trial; number thirty-seven, error of the court in overruling appellant's motion to modify the judgment.

The amended complaint on which the cause was tried was predicated upon the theory of cruel and inhuman treatment. After alleging the marriage of the parties, their respective place of residence, and their separation, the complaint alleged acts of cruel and inhuman treatment toward the appellee by the appellant, in words and figures as follows, to wit: "defendant at the time of said separation and for some time prior thereto had a violent and ungovernable temper, threatened plaintiff with bodily harm, continually nagged and upbraided him, embarrassed him before his friends, and failed and refused to exercise toward him that courtesy, kindness and consideration which was due him from her; that as a result of the aforesaid acts plaintiff's peace of mind was continually disturbed, and his health became impaired, and it became impossible for him to continue living any longer with the defendant; that the aforesaid acts and conduct of the defendant occurred on the day preceding said separation, and continued at frequent intervals over a period of many months preceding the separation; that said acts were so often repeated that it is impossible for him to specify the precise dates on which they occurred, but the dates and nature of said acts are as fully known to the defendant as to him; that the defendant's aforesaid attitude toward him continues down to the present time, and she has from the time of said separation down to recent months indulged in further acts of cruel and inhuman treatment toward the plaintiff which consist, among other things, of the following,

to wit: sending unkind and defamatory letters and telegrams to plaintiff, both personally and through his counsel, and also sending unkind and defamatory letters and telegrams concerning plaintiff to numerous third persons; that the exact time and nature of said occurrences are best known to the defendant; that because of said cruel and inhuman treatment occurring since the separation it has been and still is impossible for plaintiff to live with defendant; that said state of affairs is permanent, and there is no possibility of a reconciliation between the parties; that by reason of the aforesaid occurrences the continuance of said marriage aggravates the differences and difficulties that have long existed between the parties and is detrimental to the health and welfare of both of them, and that said marriage should be dissolved." The complaint alleged further, that upon the 22nd day of March, 1926, the appellant and appellee entered into a postnuptial contract in which it was recited that differences had arisen between them and that it was no longer possible for them to live together as husband and wife; that they were each the owner of certain tracts of real estate, stocks, bonds and other securities; that for the purpose of adjusting their property rights, they were entering into said contract, and by the terms thereof would make and agree upon a division of their property and release each other from any rights they might have therein as husband or wife. The contract also provided that the appellee would pay to the appellant the sum of $1,000 per month for her support and maintenance during the balance of her natural life, on condition, however, that if the parties to the contract divorced and the appellant remarried, in such event this payment should cease. This contract was made a part of the complaint as an exhibit thereto. The amended complaint further alleged that since entering into said contract, the appellee had met with finan-

cial reverses and that it was no longer possible for him to pay to the appellant said sum of $1,000 per month for her support and maintenance; that he was willing and desired to carry out the terms of the contract in so far as it related to the division of the property as therein provided. The amended complaint closed with a prayer asking that the appellee be granted an absolute divorce from the appellant; that the court assume complete jurisdiction over the present and future support and maintenance of the appellant by appellee as an incident to the divorce action and that the court make all necessary and proper orders and decrees for the purpose of fixing the present and future obligation of the appellee for the maintenance and support of the appellant and that any provisions so made by the court's order or decrees should be decreed to supersede the condition in the contract requiring appellee to pay appellant $1,000 per month for her support and maintenance.

The allegations of the amended complaint, together with the terms and conditions of the post-nuptial contract between the parties, when considered in their entirety are sufficient to fully inform the appellant of the character and nature of the various acts and conduct of the appellant which the appellee alleged constituted cruel and inhuman treatment toward him and upon which he relied as causes for a divorce upon the ground of cruel and inhuman treatment; furthermore, from an examination of the facts pleaded in appellant's first paragraph of answer, which her counsel were pleased to call a general denial, it is clear that her knowledge and information concerning the various charges of cruel and inhuman treatment directed against her by the appellee was as full and complete as that which he possessed, and that appellant was not deprived of any substantial rights by the court's ruling on her motion to make the amended complaint more specific. *Adams Ex-*

*press Company et al.* v. *Welborn* (1915), 59 Ind. App. 330, 108 N. E. 163.

Since the court found the facts specially and stated its conclusions of law thereon, the overruling of appellant's demurrer to appellee's amended complaint, on which ruling appellant seeks to predicate error, is not available to her, for the same questions again arise on the exceptions to the conclusions of law on the facts specially found; so this ruling on the demurrer was rendered harmless. *Scanlin* v. *Stewart et al.* (1894), 138 Ind. 374, 37 N. E. 401; *Swarthout et al.* v. *McDonald Mortgage and Realty Company* (1936), 102 Ind. App. 298, 199 N. E. 467; and authorities there cited.

The second and third paragraphs of appellants' answer did not allege facts but they were in the nature of legal arguments. Appellee's separate demurrer to each of these two paragraphs of answer was properly sustained.

For the purpose of further ascertaining the questions correctly presented for consideration by the remaining assignments of error, it becomes necessary that we examine appellant's motion for a new trial and the propositions, points and authorities set out in her brief in order that we may determine, even though the causes alleged for a new trial may be such as are recognized by our code, whether they have been presented and discussed in her brief under propositions, points and authorities in such a manner as to comply with the rules of this court and are thus properly before us for examination.

Of the ninety different causes assigned for a new trial she has referred to but forty-two in that portion of her brief devoted to propositions, points and authorities. Many of these alleged causes for a new trial are not recognized as such under our Code and present no ques-

tion for consideration. In one instance eight of these alleged causes are referred to as a group and not separately and severally. In other instances only the alleged cause for a new trial is set out with nothing more accompanying it. Appellant seeks to support some of the causes by stating abstract propositions of law and citing authorities in support thereof, but she fails to make a specific application of them to the instant case or to support their applicability to the error complained of by any reason or argument. After a thorough examination of the appellant's brief it is very manifest that there are but two recognized causes for a new trial properly presented therein for consideration, namely: that the decision of the court is not sustained by sufficient evidence and that it is contrary to law.

Of the errors properly assigned for reversal, we finally have left for examination the overruling of appellant's motion for a new trial for the two causes above enumerated, the errors founded upon appellant's exception to the several conclusions of law, except conclusion number four, which is waived, and in overruling appellant's motion to modify the judgment.

The court found the facts to be as follows:

### "Finding No. 1.

"Plaintiff and defendant are husband and wife. They were married in New York City, New York, on July 20, 1909, and lived together as husband and wife until the month of December, 1925, at which time they separated. Defendant continued to live in New York City. Plaintiff for a few months after the separation resided in Chicago, Illinois, after which he moved to Hammond, Lake County, Indiana, where he has continued to reside down to the present time, and now resides. He does now reside and has continuously resided since a date more than two years prior to the commencement of this action at No. 5219 Hohman Avenue in said city of Hammond, Indiana. This court has jurisdiction of both of the parties and of the subject-matter of this action.

"Plaintiff is now seventy-three years old and defendant is sixty-one years of age. Each party was married once previous to the present marriage. Neither party has any children by this marriage, or previous marriage, and no children were ever born of this marriage.

### FINDING NO. 2.

"Said separation was caused and made necessary by the cruel and inhuman treatment of the defendant toward the plaintiff, which cruel and inhuman treatment consisted among other things of the following acts and conduct of the defendant, to-wit: Defendant at the time of said separation and for a period of about two years prior thereto exhibited a violent and ungovernable temper toward plaintiff; threatened him with bodily harm; frequently nagged and upbraided him; embarrassed him before his friends and the public, and failed and refused to exercise toward him that courtesy, kindness and consideration normally shown by wives to their husbands. More particularly she did during that period on at least one occasion menace him with a loaded pistol then held in her hand; and on another occasion menaced him with a dagger then held in her hand; and on another occasion slashed a painting on the wall of their home with this dagger. During a period of months preceding the separation and continually down to the separation she habitually kept said gun under her pillow in her room adjoining the one in which plaintiff slept. She did on several occasions during that period verbally threaten to the plaintiff that she would "get him," and on the day of separation during a quarrel with him she repeated this threat. Immediately thereafter plaintiff left the defendant. During said two-year period immediately preceding the separation defendant's conduct was of a character sufficient to disturb plaintiff's peace of mind, put him in fear of bodily harm and made it impossible for him to continue living any longer with the defendant. He left her because of said course of conduct, and because of fear of bodily harm arising from her said threats and acts, which threats and acts were sufficient to inspire such fear in the mind of an ordinary man.

"During said two-year period, in addition to the aforesaid threats of bodily harm, defendant indulged in another course of conduct calculated to show her hostility toward and contempt for the plaintiff and which had the effect of embarrassing him before his friends, to-wit: She adopted as her personal slogan "The more I see of men the better I like dogs," and gave this slogan wide publicity by interviews with newspaper reporters, as a result of which she caused herself to be quoted in all the newspapers of New York City as the author of this slogan and publicly identified her name with it, to the public humiliation and embarrassment of plaintiff.

### FINDING NO. 3.

"Subsequent to the separation beginning in 1927 and extending down to May, 1936, defendant indulged in further acts of cruel and inhuman treatment toward the plaintiff which consisted among other things of sending unkind, defamatory and scurrilous telegrams to the plaintiff. During this period she sent a total of seventy-five or a hundred telegrams to him, twelve of which are introduced in evidence and which evince a continuing bitter and in some instances threatening attitude by her toward the plaintiff. More specifically to summarize the contents of said telegrams which were introduced in evidence she therein accuses him by innuendo of improper conduct with his niece; states that 'it will make a delightful scandal'; and states to him 'if you want a divorce . . . it will cost you $250,000.00 cash.' She states in one of these telegrams that she has detectives watching him, and she so testified. In another telegram she calls him a liar; in another she refers to him as 'you poor fish' and warns him 'be quite sure you have my alimony here the first of the month.' In another she states 'in the hour of thy vengeance oh God let mine be the hand that strikes. . . .' In another she accuses him of associating with 'gutter snipe'; in another she says in part 'Do you realize that when you die Almighty God won't accept any of your excuses or alibis in your crime'; in another she upbraids him as being 'too old to know anything but the waitress at your club regarding home'; in another she again accuses him of association with

'gutter snipe'; in still another she refers to members of his family saying 'they seem to change their addresses like public enemies.'

"In addition to said telegrams sent by her to the plaintiff she did on at least one occasion during that period send a telegram to a banker with whom plaintiff had business dealings, saying in part: 'Very strange to me ... that a reputable bank would continue to be the trustee of a notorious swindler.' (Referring to plaintiff as the swindler.) There is no evidence that the statements contained in said telegrams were true.

"During said period from 1927 to the present time defendant commenced nine different lawsuits from time to time against plaintiff in various state and federal courts of Illinois and Indiana concerning various alleged property rights asserted by her against him.

"Said course of conduct by the defendant since the separation has continued to render it impossible for plaintiff to live with the defendant, and it is apparent that this condition of affairs is permanent.

"From all the evidence in the case the court finds the fact to be that beginning about two years prior to the separation and continuing down to the present time defendant has engaged in a course of unwarranted and unjustified conduct which caused plaintiff to endure suffering and distress to such a degree as to wholly destroy his peace of mind and made life with the defendant unbearable, and which completely destroys the real purpose or objects of said matrimony; that by her said course of conduct, both before and after the separation, she humiliated and annoyed him, and insulted, vexed and harassed him.

### FINDING NO. 4.

"At the present time plaintiff's net worth is approximately $35,000 to $55,000.00, and most of this consists of equities in heavily encumbered properties. His assets are approximately as follows:

"(a) He owns the Lake County Printing & Publishing Company which publishes the Hammond Times, a daily newspaper. The total assets of this company are worth between $240,000.00 and $260,-

000.00 against which is a mortgage indebtedness totalling $211,000.00, principal and interest. Fifty thousand dollars principal of this mortgage, plus accrued interest, falls due July 1, 1936. He has an equity of $29,000.00 to $49,00.00 in this property.

"(b) He owns the Aroma Stock Farm Company. which owns a farm at Kankakee, Illinois, having a gross value of about $40,000.00 from which is to be subtracted an $8,000.00 mortgage thereon, leaving a net value of about $32,000.00.

"(c) He owns a corporation known as Hieland Estates, Inc., which owns thirty acres of land on the Kankakee River near Kankakee, Illinois, worth about $6,000.00.

"(d) He owns a corporation known as Hieland Golf Course, Inc., which owns a golf course at Kankakee, Illinois, subject to a $125,000.00 mortgage. He has an equity of about $5,000.00 in this property.

"(e) He owns a corporation known as Hammond Realty Company which owns real estate in Hammond, Indiana, subject to two mortgages totalling $210,000.00 plus accrued interest. These mortgages are two years in default and taxes and assessments are also in arrears, and the corporation's property is not worth as much as the mortgages.

"(f) He also owns certain stock worth $2,-500.00.

"The foregoing are all of his assets and they total from $74,500.00 to $94,500.00 (depending on whether the newspaper in Item a, *supra*, is considered as worth $240,000.00 or $260,000.00).

"Against the foregoing assets plaintiff has a personal indebtedness of approximately $40,000.00 consisting of promissory notes, and his personal guarantee on certain bonds hereinafter described. Subtracting this indebtedness from his total assets leaves his net worth between $34,500.00 and $54,-000.00, or in round figures between $35,000.00 and $55,000.00.

"In addition to his aforesaid indebtedness, and not included in the foregoing computation is a $50,-000.00 contingent liability now existing against him personally in connection with a transaction whereby the Union National Bank of East Chicago, Indiana, took over the assets and assumed the liabili-

ties of Indiana Harbor National Bank. Plaintiff was the owner of $50,000.00 par value of the stock of the Indiana Harbor National Bank and he entered into a written agreement with the Union National Bank to indemnify the latter bank against loss up to the amount of $50,000.00 if the assets taken over should ultimately be insufficient to pay the liabilities assumed. This has not yet been determined. He has not yet been obliged to pay anything on that contingent liability, and it is not yet known whether he will be required to pay thereon.

"In addition to the aforesaid bank transaction plaintiff has been obliged to incur and pay off substantial indebtedness on his stockholder's liability and other obligations in another closed bank, the Hammond National Bank & Trust Company, and the value of real estate and business properties has in general diminished substantially in the City of Hammond, Indiana, during the depression. The evidence indicates that plaintiff's assets have diminished substantially during the period from March, 1926, to the present time, but does not indicate the exact amount of this diminution.

## Finding No. 5.

"The evidence does not indicate the exact extent of defendant's financial worth at the present time due to the fact that she refrained from introducing any evidence which would enlighten the court on that subject. However, evidence on that subject was introduced by the plaintiff consisting of exemplified court records from other states wherein she has been in litigation regarding her property, and also consisting of testimony of the plaintiff, by which it is shown, and the court finds the fact to be that all the property which defendant had at the time of the separation had previously been given to her from time to time by plaintiff; that prior to the separation he had given her between $300,000.00 and $400,000.00 worth of real estate, securities and personal effects; that since the separation he has paid her a total of $123,000.00 in cash, consisting of monthly payments of $1,000.00 which he made to her under the separation agreement hereinafter described, plus payments, which he made to her under a certain lease described in that agreement.

In addition he has, since the separation, turned over to her $22,500.00 par value bonds of said Hieland Golf Course, Inc., and $11,700.00 par value bonds of said Hammond Realty Company in settlement of certain additional claims made by her in litigation against him since the separation.

"In the fall of 1930 and early part of 1931 defendant's assets consisted approximately of the following as shown by the ninth paragraph of a certain verified petition filed by her in the Supreme Court of New York County, New York, on May 21, 1931, to-wit: a safe deposit box in New York City containing personal property of defendant consisting of jewelry, etc., of the approximate value of $75,000.00; a deposit to her credit in Chase National Bank of New York City in the sum of $29,363.88, plus certain securities of a value in excess of $36,000.00 held by said Bank as custodian in her behalf, making total assets of approximately $464,000.00.

"It is further shown by the records of the Circuit Court of Calhoun County, Michigan, that upon her application said court did by its decree of March 23, 1935, and its supplemental decree of April 13, 1935, turn over to her the total sum of $174,196.00 in money, plus the following jewelry, to-wit: one string of large pearls in a red case; one string of small pearls in a green case; 18 rings; 2 earrings; 12 bracelets; 9 bar pins; 3 neck chains; 2 wrist watches; 3 dress clips; 1 pendant; 2 lorgnettes on chains, which cash and jewelry was then in the hands of the clerk of said court. The exact value of said jewelry is not shown by the evidence, but the evidence does show that subsequently defendant described said jewelry as being "of great value." The evidence does not show what further property she may have had at that time. There is no evidence that she suffered diminution of her estate between the time of the separation and the present time, or if there was diminution, the extent thereof.

"Inasmuch as defendant has entirely refrained from enlightening the court on that subject, the court is unable to fix the exact amount of her financial worth, but it does satisfactorily appear from all the evidence and the court finds the fact to be that her present worth is at least several times

greater than that of her husband; that she has ample property for her support at the present time and during the remainder of her life, and has much greater means of supporting herself than her husband has of supporting himself; that she does not need support and maintenance from him and has not needed it during the period since April 30, 1932.

## FINDING NO. 6.

"On March 22, 1926, the parties entered into the separation agreement which is correctly set forth as Exhibit 'A' of the amended complaint herein, and which for brevity is referred to instead of repeating the same in these findings. Said separation agreement has been completely executed and plaintiff has performed all his obligations thereunder except that he has not paid the defendant any part of the monthly payments of $1,000.00 per month therein specified for her support and maintenance since April 30, 1932. (This fact appears from defendant's sworn plea in abatement in this cause and from other evidence in the cause.) Since April 30, 1932, plaintiff has been and now is financially unable to make said monthly payments.

## FINDING NO. 7.

"The $22,500.00 par value of Hieland Golf Course, Inc., bonds owned by defendant as aforesaid have endorsed thereon the personal guarantee of plaintiff, guaranteeing the payment thereof."

The contract, referred to as Exhibit "A" in Finding No. 6, omitting the signatures of the parties, is in the following language:

"THIS AGREEMENT entered into the 22nd day of March, A. D. 1926, between Sidmon McHie of the City of Chicago, State of Illinois, party of the first part, and Isabel D. McHie, his wife, of the City of New York, State of New York, party of the second part: Witnesseth:

"Whereas, for a period of seventeen years and until the month of December, 1925, the parties lived together as husband and wife, at which time and because of irreconcilable difference they separated and have since continued to live apart;

"And Whereas, the first party is the owner of certain personal property, in the form of bank stock, stocks and bonds of a printing and publishing corporation and a corporation engaged in the real estate business in the City of Hammond, Lake County, Indiana, a corporation engaged in the real estate business in Kankakee County, Illinois, a certain villa or dwelling at St. Cloud, a suburb of the City of Paris, in France, a Rolls Royce limousine, model 1923, now in the City of New York, and certain miscellaneous stocks and bonds with the nature and value of which the second party is fully advised. And the second party is the owner of certain real estate consisting of a lot and five-story dwelling at 18 W. 53rd Street, in the City of New York, certain bonds of the Erie Railroad, stock of the American Tobacco Company, bonds of the Hammond Realty Company, of Hammond, Indiana, and certain miscellaneous personal property, with the nature and value of which the said first party is fully advised. And the parties, together, are the owners of certain paintings, household furnishings, works of art and miscellaneous personal effects as to the nature and value of which both parties are fully advised, and all of which property has been purchased by the first party during the period of said marriage, the property so owned by the second party having from time to time been given to her by the said first party;

"And Whereas, the parties, because of incompatibility, disagreements and friction are unable to live together, except at the sacrifice of their mutual comfort, health and happiness, and accordingly intend and contemplate that their present separation shall be permanent, in connection with which separation it is the intention and the desire of the parties that there be a complete, final and effective decision and settlement of their respective rights and holdings, provision made for the support of the second party, and the relinquishment of all right, interest and claims which the one party might otherwise have upon the property of the other.

"Now, therefore, in consideration of the premises and to accomplish the end sought, both parties with full knowledge of the extent, value and character of the properties owned by them separately and jointly, and of their respective income, obligations

and needs, do fully and voluntarily agree as follows:

"First: The second party shall have, hold, own and enjoy as her sole and separate estate, the following property: the real estate above described known as 18 W. 53rd St., in the City of New York, subject to such rights as the first party now has therein by virtue of a lease heretofore executed between the parties; the bonds of the Erie Railroad Company and the Hammond Realty Company; the stocks of the American Tobacco Company above described, with all interest, dividends and accruals thereon; the Rolls Royce limousine above described, all paintings, works of art, household furnishings and personal effects of the second party in the apartment now occupied by the second party at 381 Park Avenue, in the City of New York, at the Reinhardt Art Galleries at 57th St. and 5th Ave., in the City of New York and elsewhere, except wearing apparel, golf trophies, sporting accessories and the personal effects of the first party in said apartment in the City of New York, which he shall retain;

"Second: The first party shall have, hold, own and enjoy as his sole and separate estate the following property: The villa above described at St. Cloud, near Paris, France, all of the stocks, bonds, securities, investments and property of every description now owned and held by him in said bank, printing and publishing and real estate corporations in Indiana and Illinois above described and elsewhere, his wearing apparel, golf trophies, sporting accessories and personal effects, described in the first clause of this agreement;

"Third: The second party is now receiving as income from the Erie Railroad Company bonds and stocks of the American Tobacco Company above described, a sum in excess of $8,000.00 per year, she is also receiving as rent from the first party under the lease to said property located on West 53rd Street in the City of New York, the sum of $10,000.00 per year. To provide for her continued support and maintenance, the first party agrees that he will continue to pay the second party, rental under said lease, during its unexpired term, or the term of any renewal thereof, or until she sells said property, if she shall sell it before the expiration of said lease or renewal, guaranty to the second party

a net income from said property after the payment of taxes by the first party, of $10,000.00 a year to be paid when and as said lease provides. In addition to said rental the first party agrees to pay the second party, during the remainder of her life, while the wife or widow of the first party and while she remains unmarried, if the parties are divorced, the sum of $1,000.00 per month, which payment shall be made to her on the first day of each month, at such place in the City of New York, or elsewhere as the second party shall direct. The first party agrees to pay the rental on the apartment now occupied by the second party at 381 Park Avenue in the City of New York until the expiration of the present lease, October 1, 1926. The foregoing provisions guaranty a rental on said property on West 53rd St., New York, for the payment of rental on the apartment now occupied by the second party at 381 Park Avenue, New York, for monthly payment to the second party for her maintenance and support shall be binding on the heirs, executors and administrators of the first party. It is expressly agreed that the provisions herein made for the support of the second party, is and shall be accepted by her in full discharge of any claim that she now has or may hereafter have against the first party for support and maintenance, and so long as the first party shall continue to make said payments the second party agrees that she will not ask for other or additional payments or allowances, either out of court or in any action that may be brought for a divorce, separate maintenance or support or in any proceeding in law or equity in any jurisdiction, in which there shall come in question obligations arising out of the marriage relations of the parties.

"It is agreed that the first party shall not hereafter be obligated on any bills contracted by the second party;

"Fourth: The first party agrees to and by the execution of this instrument releases, quit-claims, grants and conveys to the second party all his right, title, and interest in and to said real estate on West 53rd Street, in New York. The second party agrees to and does by the execution of this instrument, release, quit-claim, grant and convey to the first party all her right, title and interest in and to said villa in France, it being the intention of each

party to release to the other all the interest or title that he or she may now have in the real estate of the other respectively, whether by courtesy, dower or otherwise. And it is agreed that each party may convey or encumber said respective pieces of real estate so owned by them without the other party joining in any instrument of conveyance or encumbrance. It is further agreed that neither party shall have any right, title or interest in any property, real or personal, hereafter acquired by the other party.

"Fifth: The parties did on the 12th day of May, 1919, make a certain written contract in the City of New York by which they agreed to execute reciprocal wills, making certain provisions, particularly set out in said contract, for the disposition of such property as should be owned by them at the time of their respective deaths. Said agreement was made when the parties were living together in harmony and contemplated that they would continue to so live. Their relations having changed, in order to make effective this final permanent settlement of their respective property rights, it is now agreed as one of the considerations of this contract that said agreement of May 12, 1919, shall be and the same is hereby cancelled, rescinded and set at naught, in whole and in particular. Each party waives and releases the property of the other, now owned or hereafter acquired from any claim or title, contingent, reversionary or otherwise, and from any right of inheritance or descent it being the intention of each and both parties that during their respective lifetimes they may deal with their separate estates as herein described and defined as if they were unmarried and that upon the death of either, the property, both real and personal, then owned by him or her shall pass by his or her will under the laws of descent as the case may be, free from any right of inheritance, title or claim in the other party and as if the parties at such time were unmarried. Provided, however, that the obligations of the first party to make monthly payments for the support and maintenance of the second party; guaranteeing to the second party a net income of $10,-000.00 per year on the property known as 18 W. 43rd Street, in the City of New York, and agreeing to pay the rental of the apartment now occupied by

the second party at 381 Park Avenue, in the City of New York, as provided in clause three of this agreement, shall continue in effect and be binding upon the heirs, executors and administrators of the first party upon his death, if the second party shall survive him, anything in this agreement to the contrary notwithstanding.

"Sixth: It is agreed that the parties shall live apart and separate and shall not annoy or molest each other.

"Seventh: The first party agrees to pay one-half of the legal expenses incurred by the second party in connection with this settlement agreement."

Upon this special finding of facts, the court concluded the law to be as follows:

"Conclusion No. 1. Plaintiff is entitled to a decree of absolute divorce from the defendant.

"Conclusion No. 2. This court in this cause has complete jurisdiction to make such decree of alimony as the circumstances of the case shall render just and proper. The court concludes, however, that under all the circumstances of the case as set forth in the findings defendant is not entitled to be allowed any alimony.

"Conclusion No. 3. The decree should confirm to each party the absolute ownership of the property, real and personal, now held by him or her, whether acquired by virtue of said separation agreement of March 22nd, 1926, or otherwise. Transfers of property made pursuant to said agreement should be confirmed on the ground that they are executed transfers, regardless of whether said agreement was originally enforcible or not. The provision made in said agreement for plaintiff to pay defendant One Thousand Dollars ($1,000.00) per month for her support and maintenance is not binding on this court so far as the same remains unperformed. The term 'Property' as used in this conclusion does not include any rights of action or causes of action, present or future, which might be asserted by defendant against plaintiff by virtue of said separation agreement. This subject is covered by Conclusion No. 5, *infra*.

"Conclusion No. 4. In order to do equity the court should confirm the aforesaid personal guar-

antee endorsed by the plaintiff upon said $22,500.00 par value Hieland Golf Course, Inc., bonds held by the defendant, and her rights under said guarantee should be preserved.

"Conclusion No. 5. The decree herein rendered settles and terminates all obligations of the plaintiff to the defendant with respect to her support and maintenance. It also terminates all rights of action and causes of action whatever which defendant might otherwise assert now or in the future against plaintiff or his estate by virtue of said separation agreement of March 22, 1926, described in the findings. It also settles and terminates any other financial obligations, rights or claims of any kind which might be asserted by either party against the other arising from anything occurring prior to this time, except on plaintiff's guaranty on said Hieland Golf Course, Inc., bonds above described."

The evidence is sufficient to sustain the court's special finding of facts. The remaining alleged errors present substantially the same questions and will be discussed together.

It is quite essential that we do not lose sight of the issues joined and presented before the trial court in the instant case. This is not an action by a survivor to a postnuptial contract to enforce rights thereunder where the marital relation still existed at the time of the death of the other party to the contract. Nor is it an action to enforce rights under a postnuptial contract where, since it was entered into, the parties have been divorced and in the adjustment of property rights between the parties the contract was permitted to stand without modification by the court. Neither is it an action to enforce rights under a postnuptial contract where the interests of third parties are involved. But this is an action for divorce and adjustment of property rights between husband and wife, who previous to the action had entered into a contract for the purpose of settling their respective property rights and providing for the maintenance of the wife based upon various elements

which must necessarily be considered in agreeing to such a contract at the time it is entered into.

It is agreed by the parties and the court found it to be a fact, that the appellee had performed and completely executed all his obligations under the postnuptial contract at the time when he commenced his action for a divorce and up to the date of the trial thereof, except that he had failed to pay the plaintiff the sum of $1,000 per month for her maintenance as provided in the contract from April 30, 1932.

It is earnestly and ingeniously contended by appellant that even though an absolute divorce was granted to appellee, the trial court had no authority, power or jurisdiction to include in its decree, awarding such divorce and adjusting their respective property rights, a condition releasing appellee from the obligation under the postnuptial contract to pay the past due installments for appellant's maintenance and to release appellee from further payments thereof after the granting of the divorce. We do not concur in appellant's contention.

"The power to grant a divorce is a statutory and not a common law power. At the time of the establishment of the United States as an independent nation and the adoption of the common law of England by the several states, matrimonial causes in England were within the exclusive jurisdiction of the ecclesiastical courts." 19 C. J. §§28, 29, p. 23.

It is necessary, therefore, in order to ascertain the authority, power and jurisdiction of our courts to grant divorces, that we revert to the statutes of our state. Section 3-1203 Burns 1933 (§904 Baldwin's 1934), provides that:

"Divorces may be decreed by the Circuit, Superior, or other courts of this state, upon which such jurisdiction has been or may be conferred."

Section 3-1217 Burns 1933 (§926 Baldwin's 1934), provides that:

"The court shall make such decree for alimony, in all cases contemplated by this act, as the circumstances of the case shall render just and proper; and such decree for alimony, heretofore made or hereafter made, shall be valid against the husband whether asked for in the petition or given by the judge on default."

Section 3-1218 Burns 1933 (§932 Baldwin's 1934), provides that:

"The decree for alimony to the wife shall be for a sum in gross, and not for annual payments."

With full knowledge of these provisions of our statute defining the authority, power and jurisdiction of our courts in divorce proceedings, the parties in this case saw fit to and did choose the lower court as the forum in which to litigate and adjust their respective marital and property rights.

In the absence of the relation of husband and wife existing between appellant and appellee there would have been no obligation resting upon the appellee to support appellant. It cannot be conceived that the parties could enter into a contract providing for the support of the appellant by appellee even though their marital rights might have terminated and that under our statutes the court would be estopped from inquiring into the reasonableness and the equity of the contract tested by the circumstances of the parties and their property existing at the time of the granting of the decree of divorce.

If it be conceded that the appellee agreed with appellant that they should live separate and apart and that he would in addition to settling certain property upon her pay to her the sum of $1,000 per month for her maintenance, it cannot be assumed that if the appellee, because of cruel and inhuman treatment inflicted upon

him by the appellant, should seek and obtain an absolute divorce from her because of such treatment, impliedly agreed that he would not, in the same action, seek an adjustment of all their property rights, including relief from payment of money for her maintenance. *Stultz* v. *Stultz* (1886), 107 Ind. 400, 8 N. E. 238.

Postnuptial separation agreements, if properly made after separation and not for the purpose or calculated to promote a separation or divorce, will usually be received in evidence and upheld if fair, equitable and just, in a divorce proceeding and followed in the decree, except that such agreements in so far as they attempt to bind the court as to the disposition and care of children and in the matter of maintenance and alimony will not be given binding force by the court. "Some courts take the view that a contract of separation is incapable of the exact performance which may be made of a business contract, and that the same strict principles, or the same considerations that are applied to or govern the duties of parties to business contracts, cannot always govern or be applied to the enforcement of every provision of a separation agreement." 30 C. J. p. 1064. *Duryea* v. *Bliven* (1890), 122 N. Y. 567, 25 N. E. 908. For other cases announcing the same general principle see *Edleson* v. *Edleson* (1918), 179 Ky. 300, 200 S. W. 625, 2 A. L. R. 689; *Dickey* v. *Dickey* (1928), 154 Md. 675, 141 Atl. 387, 58 A. L. R. 634 (note); *Gloth* v. *Gloth* (1930), 154 Va. 511, 153 S. E. 879, 71 A. L. R. 700; *Apfelbaum* v. *Apfelbaum* (1932), 111 N. J. Eq. 529, 162 Atl. 543, 84 A. L. R. 298.

In *Thompson* v. *Thompson* (1892), 132 Ind. 288, 31 N. E. 529, the court announced the rule that husband and wife do not have the power to make valid contracts relating to alimony. In *Rose* v. *Rose* (1883), 93 Ind. 179, 183, the Supreme Court, discussing the distinction between settlements made before and after marriage,

said: "The important distinction between settlements made before and those made after marriage is, that while the former have the contemplated marriage as a consideration to support them, the latter are without any such consideration. Postnuptial settlements are usually nothing more nor less than gifts of real or personal property, or of both, between husband and wife, which equity places, notwithstanding the disabilities of coverture, upon the same footing with other gifts."

The rule is well established by the authorities in this state that in a divorce proceeding, the trial court under our statutes has broad powers in adjusting the property rights of the parties, and that its action in such matters will not be disturbed on appeal, unless it is apparent that there has been an abuse of discretion.

Under our statutes the determination of the amount of alimony to be allowed in each case depends upon its own facts, and in arriving at the amount, it is the duty of the trial court to take into consideration the financial condition of the husband, the source of any property owned by him, his income, ability to earn money, his conduct toward his wife and his his wife's separate estate. *Temme* v. *Temme* (1937), 103 Ind. App. 569, 9 N. E. (2d) 111.

The courts of this state have adopted and adhered to the rule that where the husband and wife have entered into a contract affecting their property rights, and "the wife proves recreant to her marriage obligations, and has destroyed the marital union by her misconduct, and her husband is thereby entitled to a decree of divorce, the court granting the same has the discretionary power, and, under proper circumstances warranting the same will generally exercise it, and allot to the injured husband such a portion of the property or means which he had settled upon the wife

as will place him in the position, to some extent at least, which he would have occupied had the union continued." *Muckenburg* v. *Holler* (1867), 29 Ind. 139; *Thompson* v. *Thompson, supra;* *Walker et al.* v. *Walker et al.* (1898), 150 Ind. 317, 50·N. E. 68; *Watson* v. *Watson* (1905), 37 Ind. App. 548, 77 N. E. 355; *Wise* v. *Wise* (1917), 67 Ind. App. 647, 119 N. E. 501; *Swift* v. *Swift* (1922), 79 Ind. App. 199, 137 N. E. 568; *Keaton* v. *Keaton* (1927), 87 Ind. App. 39, 158 N. E. 251.

"That the husband is usually the stronger may be true; but that he is not always the dominating force in the marriage union is known from many well authenticated instances existing from the present back to the time of Delilah. A few of these have gotten into the law books." *Basye* v. *Basye* (1899), 152 Ind. 172, 175, 52 N. E. 797, and cases there cited.

The court found facts from which it concluded that the appellee was entitled to an absolute divorce from the appellant because of cruel and inhuman treatment. The court also found as a fact, that from July 20, 1909, the date of the marriage of the parties, up to July 30, 1936, the date on which they were divorced, the appellee had given to the appellant property of various kinds totalling approximately $464,-000 and there was no evidence that appellant had suffered diminution of her estate, or, if there was diminution, the extent thereof; that the appellee's estate had depreciated in value until upon the date of the divorce its value was from $35,000 to $55,000, most of which consisted of equities of uncertain value.

" 'If the ultimate judgment deals justly with the parties, gives to each his legal rights, and is sustained by the facts appearing in the special finding, an error in one of the conclusions of law will not justify a reversal.' " *Hilbish* v. *Hattle* (1896), 145 Ind. 59, 71, 44 N. E. 20.

On the whole record we conclude that the decision of the trial court is not contrary to law, that its conclusions of law were correct and that the appellant's motion to modify the judgment was properly overruled.

Finding no reversible error, the judgment is affirmed.