## BAHRE v. BAHRE.

[No. 19,504. Filed April 12, 1962. Rehearing denied May 17, 1962. Transfer denied June 28, 1962.]

*Sidney A. Horn, Paul Rochford, John J. Rochford, Paul E. Blackwell, Frank W. Morton, Rochford & Blackwell,* all of Indianapolis, *Ivan Pogue,* and *Pogue &Young,* of Franklin, for appellant.

*Harry M. Stitle, Jr.,* of Indianapolis, and *Richard L. LaGrange,* of Franklin, for appellee.

MYERS, J.—This is an action for divorce brought by appellant against appellee in the Marion Superior Court No. One, and, on change of venue, tried in the Johnson Circuit Court.

The issues were formed by appellant's amended complaint, which alleged that appellee was guilty of cruel and inhuman treatment toward appellant; that appellant was a fit and proper person to have the care and custody of the two minor children of the parties; that appellant was a patrner in a construction business with appellee; that the successful business enterprise resulted in the acquisition of jointly-held real estate and personal property. Appellant asked for an accounting with reference to rental income, profits · and property, an absolute decree of divorce, custody of the children, support money and judgment for alimony.

Appellee filed an answer in one paragraph, in conformity with Supreme Court Rule 1-3, wherein he denied the above allegations. He filed his cross-complaint for absolute divorce, alleging that appellant was guilty of cruel and inhuman treatment. To this appellant filed an answer in general denial, pursuant to Supreme Court Rule 1-3.

Trial was had before the court and judgment rendered on September 28, 1959, in favor of appellant under her amended complaint and against appellee on his cross-complaint. Appellant was granted an absolute divorce and custody of the two children. Appellee was ordered to pay $20 per week for each child when they were with appellant and was excused from so doing when they were away at school or visiting appellee. Appellee was given the right to have the children visit him for the month of July each year, plus other visitations at their home. Appellee was to provide all travel expenses in connection with the visitations. Appellant was decreed to be the owner of all corporate stocks in her name, and of a 1956 Jaguar, a 1951 Plymouth, and a 1941 Ford. She was also decreed to be the owner of the parties' residence in the State of Arizona, together with all household furniture, equipment, fixtures and personal property located therein.

Appellee was decreed to be the owner of all corporate stocks in his name, and of all property in the name of the parties located in the State of Indiana, including real estate and personal property. Appellee was decreed to be the sole owner of the construction business known as "George Bahre Company," including all tools, equipment, materials, motor vehicles, office supplies, fixtures and accounts receivable, with the obligation that appellee pay all debts and lia-

bilities. Each party was given all bank accounts in their respective names. Appellant recovered an alimony judgment against appellee in the sum of $24,400, payable over a period of ten years and two months in equal installments of $200 a month, commencing October 10, 1959. Appellee was ordered to pay final attorney fees and expenses for appellant's counsel. Appellant filed a motion for new trial and a motion to modify and correct the judgment, both of which motions were overruled. This appeal followed. The assignment of errors is based upon the overruling of the motion for new trial and the motion to modify and correct the judgment.

The basis of the appeal is that the award of alimony and support allowance are inadequate and insufficient, not being supported by the evidence and being contrary to law. No question is raised concerning the granting of the divorce or the attorney fees. Essentially, the problem presented to us is whether or not the trial court abused its discretion in making these awards.

Our statute, §3-1217, Burns' Ind. Stat., 1946 Replacement, provides that the court shall make such decree for alimony in all cases contemplated by the act, as the circumstances of the case shall render just and proper. It is a well-settled rule that the question of the amount of alimony to be decreed in any case is a matter of judicial discretion within the province of the trial court. This court will not interfere with the exercise of that discretion unless it is apparent that the discretion has been abused. *Yost* v. *Yost* (1895), 141 Ind. 584, 41 N. E. 11.

There are no hard and binding rules, nor is there any single test, which may be followed for the

guidance of the court in its award of the sum ■ which the husband shall pay to his wife whom he has injured by reason of the wrongs and grievances of which she had complained and which she has sustained by the evidence upon trial. *Glasscock* v. *Glasscock* (1884), 94 Ind. 163; *Ralston* v. *Ralston* (1942), 111 Ind. App. 570, 41 N. E. 2d 817; *Smith* v. *Smith* (1960), 131 Ind. App. 38, 169 N. E. 2d 130. However, in determining the amount of alimony in a particular case, our courts have stated that certain factors must be investigated and considered. They are (1) the existing property rights of the parties, *Shula* v. *Shula* (1956), 235 Ind. 210, 132 N. E. 2d 612; *Ferguson* v. *Ferguson* (1955), 125 Ind. App. 596, 125 N. E. 2d 816; (2) the amount of property owned and held by the husband and the source from which it came, *Poppe* v. *Poppe* (1944), 114 Ind. App. 348, 52 N. E. 2d 506; *McHie* v. *McHie* (1939), 106 Ind. App. 152, 16 N. E. 2d 987; (3) the financial condition and income of the parties and the ability of the husband to earn money, *Logan* v. *Logan* (1883), 90 Ind. 107; *Poppe* v. *Poppe, supra; Glick* v. *Glick* (1927), 86 Ind. App. 593, 159 N. E. 33; *Cornwell* v. *Cornwell* (1940), 108 Ind. App. 350, 29 N. E. 2d 317; *Hedrick* v. *Hedrick* (1891), 128 Ind. 522, 26 N. E. 768; (4) whether or not the wife by her industry and economy has contributed to the accumulation of the husband's property, *Yost* v. *Yost, supra;* (5) the separate estate of the wife, *Stultz* v. *Stultz* (1886), 107 Ind. 400, 8 N. E. 238.

Certain rules of thumb have been laid down to further guide the trial court, such as that an award to an innocent and injured wife should be a sum ■ as would leave her in as good condition as she would have been if her husband had died and

she remained a surviving widow. *Glick* v. *Glick, supra; Ferguson* v. *Ferguson, supra; Temme* v. *Temme* (1937), 103 Ind. App. 569, 9 N. E. 2d 111; *Dissette et al.* v. *Dissette* (1935), 208 Ind. 567, 196 N. E. 684; *Musselman* v. *Musselman* (1873), 44 Ind. 106. The wife must be left as well in non-cohabitation as in cohabitation. *Adams* v. *Adams* (1947), 117 Ind. App. 335, 69 N. E. 2d 632; *Boggs* v. *Boggs* (1910), 45 Ind. App. 397, 90 N. E. 1040; *Yost* v. *Yost, supra.*

According to the evidence presented to us by the record, the parties were married on August 17, 1939. They were people of modest means, appellee being a carpenter with weekly average earnings of from $32 to $37 per week. Appellant had no money at the time of their marriage, while appellee had saved $800 to $1,000. Within six months they had lost all his savings because of a car breakdown and an emergency operation which had to be performed on appellee. Appellant went to work as a bookkeeper for a fraternity house and did other outside jobs. At the time, they lived in a rented house in Indianapolis. Toward the latter part of 1945, appellee started in business on his own as a building contractor in Indianapolis. The name of his business subsequently became known as "George Bahre Company." They purchased a home which they also used as an office. During these early years, appellant kept the books and records, took care of the telephone, prepared the pay roll, wrote checks and performed general office functions, including the preparation and filing of federal income tax returns. Their home was mortgaged to appellee's mother. In 1946 the company ran out of funds and they placed a second mortgage on the home so as to provide money for the business.

The early years of the business were very difficult, the income for the first year being only $2,700. In 1946 they lost approximately $5,250. Then the picture changed and the company began to prosper. In round figures, it made a profit of $14,000 in 1947; $41,200 in 1953; $59,500 in 1954; $64,800 in 1955; $58,100 in 1956; $68,000 in 1957; $47,400 in 1958.

In general, the type of business in which appellee was engaged was commercial construction, which consisted of the construction, remodeling and improving of governmental and commercial buildings, schools, churches and the like. From a series of contracts introduced into evidence as exhibits by appellee, we are able to determine that when he started in business he had such contracts as one for remodeling a floor of an office building in Indianapolis for the total sum of $2,042 in 1948. Nine years later he had such contracts as one for the construction of a new church in the total sum of $1,864,805.55. From 1947 to 1949 the volume and type of the business grew and expanded so that as of April 3, 1959, he had contracts for six jobs under construction which totaled $2,022,414.76. The previous year he had done $4,216,782.58 worth of construction. In 1947 appellant paid federal income taxes in the sum of $2,163.49. Ten years later he paid $31,958.86. An accountant testified that if appellee were a single person filing a separate return, his tax rate would be in the 51 per cent bracket.

In order to obtain performance and bid bonds, appellee filed certain annual financial statements with an insurance and bonding agency. These were signed and sworn to under oath. For the years 1955 and 1956 they reflected a net worth of $567,096.94 and $729,334.96, respectively. The agent for the surety

company testified that he personally verified the information upon which these figures were based. As of October 13, 1958, appellee's financial statement for the company showed cash in bank totaling $110,926.20; stocks and bonds worth $57,420; accounts receivable worth $558,484.40; material in stock worth $3,820; equipment at book value of $42,636; real estate worth $184,975; total assets $958,261.60; that there were notes payable of $175,000; accounts payable in the sum of $188,199.56; showing a surplus or net worth of $595,062.04. The agent did not verify the information set forth in that year's report. Appellee claimed that these figures were inflated so as to increase his bonding power and continue his good credit line. However, the agent stated he relied on whatever the appellee told him. Regardless of whether these figures were inflated or not, they are an indication of the size of appellee's business.

This confidence in appellee's integrity is further reflected in the testimony of a vice-president of the bank where appellee borrowed money in connection with the business. He testified that appellee had an open line of credit up to $175,000 and had borrowed as much as $120,000 at one time on his unsecured note. He said further that the loans which the bank made to him were based on the responsibility of the figures set forth in financial statements submitted to it, as well as, "of course, on the basis of Mr. Bahre's integrity as has been demonstrated over these several years." In the opinion of the banker, appellee's company was worth around half a million dollars. The bank's relations with appellee were so good that it did not make daily, monthly or semi-annual checks of his financial affairs.

As of March 17, 1959, appellee testified that he had accounts receivable totaling $325,538.18, and notes

receivable as of February 28, 1959, in the amount of $1,525. There were accounts payable in the sum of $30,198.02, so that the net accounts receivable were $295,340.16. An accountant stated that if appellee were "to die tomorrow," those outstanding accounts receivable would be entered as income to his estate or to his beneficiaries, and in the federal estate tax return they would be shown as the equivalent of cash.

It is to be remembered that appellee was doing business as an individual. Accordingly, he withdrew from earnings sums sufficient to pay for ordinary living costs for himself and family. These withdrawals amounted to $5,882.52 in 1947, $20,731.08 in 1955, and approximately $35,000 in 1958. The company accountant testified that personal items were paid out of company funds, and that the bank account was used "to buy anything from dog food to Jaguars."

Appellee owned real estate by the entireties with appellant, in Indianapolis, on which was located his principal office. This property was valued at $65,000 and was free and clear of any liens, mortgages or otherwise. Replacement value before depreciation was estimated at $73,820. At the time of trial, office equipment, furniture and eleven motor vehicles were valued by appellee at $29,433.56. He owned corporate securities in the approximate amount of $17,515, other real estate holdings in Indianapolis valued at $10,400, personal property in his apartment at $3,100, and a bank account of $1,000. He carried $93,000 of life insurance, payable to his wife and children, with a cash-surrender value of $8,320.66. All this, including the accounts receivable, was given to the appellee by the court's decree.

In 1956, the parties bought a house in Tucson, Arizona, so that appellant and the two boys could

live there. Improvements and repairs were made on it. Appellee testified that he could have sold it for $55,000. It was a lavish house, located in an exclusive residential neighborhood on five and one-half acres of land. Appellee had a 25,000-gallon swimming pool installed, and built a corral for horses which he bought for the boys. The court awarded this property to appellant, together with about $17,000 worth of furnishings. She was permitted to keep some $10,000 worth of securities which were in her name, three automobiles valued at $2,800, and whatever sum of money was in her bank account.

In reviewing the record, it seems that the trial court overlooked some of the factors which we have previously set forth to be considered when an alimony award is to be made. Appellee was shown to be a man who made a phenomenal business success in the short period of fourteen years. He exemplified the story of "from rags to riches." His financial condition and his income are important matters to be considered. The record shows how they increased progressively and substantially from the time he started in business for himself. By virtue of his apparent skill and ability, they grew and expanded until he had contracts involving millions of dollars of building construction. As we have previously seen, his ability to earn money is another very important factor to be considered. From what the record has presented to us, this was a proven fact.

As his fortunes grew, his standard of living increased. In 1956 he wrote his wife in Tucson that she should rent a decent home, as she was entitled to a better home than she had, and that they could afford it. He testified that she had "realized a nice income and a wonderful living and every conveyance [con-

venience] in the world from kids travel, horses, Europe, Hawaii, California, Mexico City, dogs, cats, Jaguars, Cadillacs, washers, everything." In 1957, after divorce had been suggested, he wrote her a letter in which he said: "Now, you talk silly and want to sell the house. You are only trying to hurt me by depriving the children of the nice home, pool, horses and school. As far as I am concerned keep your home and all that goes with it and live in it with our children." It seems apparent that the trial court did not properly weigh these factors in considering whether or not appellant should be left as well in non-cohabitation as in cohabitation. It is obvious that she could not maintain such a home on $2,400 a year, which sum is subject to federal income taxes. In further connection with this point, we call attention to the fact that the Judge of the Marion Superior Court, where this cause was filed originally, ordered appellee to pay appellant the sum of $1,400 per month for the support of herself and the two boys pendente lite. This order was entered September 19, 1958. The cause was finally tried and judgment entered September 28, 1959. Presumably, appellee paid this sum each month during that period of approximately one year, without objection and without making any attempt to modify the order. During that time he also paid for the schooling of his sons in Arizona, in the sum of $2,500 for one boy and $600 or $700 for the other. This he was not obligated to do, pursuant to the support order, but was purely voluntary on his part.

In view of these facts and circumstances, we are compelled to arrive at the conclusion that the trial court did not exercise proper judicial discretion, and therefore committed error, under the uncontroverted evidentiary facts in the record now

before us. *Yost* v. *Yost, supra; Glick* v. *Glick, supra.* As was said in the *Yost* case (at pages 591, 592 of 141 Ind., at page 13 of 41 N. E.) :

"We do not think, under the facts, and within the meaning and spirit of the law, it was 'just and proper' for the court, upon decreeing a divorce to appellant on account of the wrongs of appellee, to bid her depart from the forum of justice with the small amount in controversy as the sum total to be allowed in her favor."

For the same reasons, we declare there was an abuse of discretion in the order entered for the support of the minor children.

The decision of the trial court granting an absolute divorce and allowing attorney fees not having been questioned, we find it unnecessary under the facts of this case to disturb that part of the judgment; but in so far as it grants alimony and support payments, the judgment is reversed, with instructions to grant a new trial.

Ax and Cooper, JJ., concur.

Ryan, C. J., not participating.

NOTE.—Reported in 181 N. E. 2d 639.