NELSON *v.* NELSON.

[No. 29,233. Filed October 11, 1954. Rehearing denied November 15, 1954.]

604

*Thomas C. Stiffler,* of Danville, Illinois, and *Edward L. McCabe,* of Williamsport, for appellant.

*Ringer & Ringer,* of Williamsport, for appellee.

DRAPER, J.—The court is in agreement that the evidence was sufficient to sustain the decision of the trial court.

But the fact question which the trial court was required to decide was a close one at best, and a majority of the court, as represented by this writer and Bobbitt and Gilkison, JJ., are unable to avoid the feeling that the court should have heard the testimony of Switzer, who was unavoidably absent in the service of his country when the case was tried, but who was available as a witness before the case was decided. Under Rule 1-8 of this court such could have been done even after the entry of judgment.

It was represented to the trial court that if Switzer were permitted to testify he would deny the adultery and would further deny that he told the appellee he had committed the adultery. Testimony to the effect that he had not committed the adultery would be cumulative, but testimony to the effect that he had not admitted the adultery would not be cumulative. No one else did or could deny that assertion, which is the core of this case.

We do not believe it could safely be assumed that Switzer would testify falsely. To have seen him and

observed his manner of testifying and to have heard his testimony as tested by skillful cross-examination would necessarily have assisted the trial court in arriving at the truth of this lamentable situation. Entirely aside from any lack of diligence on the part of the appellee in procuring Switzer's testimony, the interest of the State as a third party made it imperative, in our opinion, that his testimony be heard.

For the reason just stated, which the Appellate Court, in the view it took of the case, thought it unnecessary to decide, the judgment is reversed and cause remanded with instructions to grant the motion for a new trial.

EMMERT, J.—This is an appeal from a judgment granting a divorce to appellee. The error assigned here is the overruling of appellant's motion for a new trial. The complaint was in two paragraphs, the first charging appellant had been guilty of cruel and inhuman treatment in that appellant told appellee she had been guilty of adultery, and the second paragraph charged that she had been guilty of adultery. The argument section of appellant's original brief contends that the admissions by the appellant were uncorroborated and therefore not sufficient to sustain a finding for appellee, that but one act of cruel and inhuman treatment is not cause for divorce, and that the trial court erred in refusing to reopen the case to permit the alleged paramour, who was a resident of Illinois, to appear and testify in denial of his alleged improper conduct. In view of the importance of the contentions, and extended discussion of the statute, cases and authorities follow:

"The right to apply for or obtain a divorce is not a natural one, but is accorded only by reason of statute,

and the State has the right to determine who are entitled to use its courts for that purpose and upon what conditions they may do so." Draper, J., in *Berghean* v. *Berghean* (1943), 113 Ind. App. 412, 416, 48 N. E. 2d 1001. It was never a common law right. *McHie* v. *McHie* (1938), 106 Ind. App. 152, 174, 16 N. E. 2d 987.

"The Roman Catholic ancestry of the Church of England led it to arrogate unto itself the matrimonial affairs and status of its members, once the brief flurry of divorce in the reign of Henry VIII was over, and the courts of common law and chancery saw fit to permit this situation to continue. The church recognized no such thing as an absolute dissolution of an originally valid marriage, which, having been joined under the ministry of God, could not be cast asunder. The courts of law and chancery deemed it none of their affair; and hence, in England, there was no recognized power or authority to grant divorces in any court which had an equivalent in this country during the Colonial times, and the only 'divorce' which could be granted by any court was a limited divorce, from bed and board, which was a matter of ecclesiastical dispensation. Not until 1809 was anything resembling a modern 'divorce court,' with decisions fairly consistently reported, set up in England; and that was still not a court of law or chancery, but one of the ecclesiastical courts especially designated for the purpose." 1 Nelson, Divorce and Annulment (2d Ed.), §1.01, pp. 1 and 2.

"Historically, as hereinabove pointed out, only parliament or its legislative equivalent could grant absolute divorces. These were more formally known as divorces 'a vinculo matrimonii.' The ecclesiastical courts, however, could and did grant divorces 'a mensa et thoro' (from bed and board), which did not dissolve the bonds of matrimony but merely gave the court's

sanction to the parties living separate and apart. Statutes in some of the states refer merely to absolute and 'limited' divorces, the latter being another term for divorce from bed and board." 1 Nelson, Divorce and Annulment (2d Ed.), §1.08, p. 18. The history of divorce in Indiana is in accord with Nelson.[1]

The rule of the ecclesiastical courts of the Church of England requiring "that credit be not given to the sole confession of the parties themselves, howsoever taken upon oath either within or without the court," (Canon 105, at the Convocation of Canterbury 1603) was never in force in this country as a part of the common law adopted by the Colonies. In England, in 1857 secular jurisdiction of ecclesiastical courts was transferred to the common-law courts. In 1858 in *Robinson* v. *Robinson*, 1 Sw. & Tr. 362, 365, 393, this common-law court emphatically declared, "it is at liberty to act and bound to act on any evidence, legally

---

1. The Ordinance of 1787 provided, "And the governor, legislative council, and house of representatives, shall have authority to make laws, in all cases for the good government of the district, not repugnant to the principles and articles in this ordinance established and declared." In 1795 a territorial law was enacted placing the jurisdiction to grant divorces in the General court and circuit courts. After the adoption of the 1816 Constitution, Ch. 35 of the Acts of 1817 (2nd Sess.), circuit courts were granted jurisdiction to decree divorces for the causes therein specified. However, this did not prohibit the General Assembly from granting divorces by special act, which was frequently done. By Ch. 31 of the 1829 Acts a divorce was granted as follows:

"*Be it enacted by the General Assembly of the state of Indiana,* That Martha McBride, of Dubois county, be, and she is hereby divorced from the banns of matrimony, from her husband Daniel McBride, as fully as if the said banns of matrimony had never been entered into."

The index of Special Acts of 1846 discloses the passage of thirty-eight special acts of divorce. Page 370, Local Laws of Indiana 1846. Many times the General Assembly authorized filing of divorce cases by particular persons in particular courts when under the General Act the court did not have jurisdiction to entertain the action.

After the adoption of the 1851 Constitution the legislature was deprived of the power to grant divorces by §§22 and 23 of Article 4.

admissible, by which the fact of adultery is established; and if therefore there is evidence, not open to exception, of admissions of adultery by the principal respondent, it would be the duty of the Court to act on such admissions, although there might be a total absence of all other evidence to support them." See VII Wigmore, Evidence, §2067, pp. 385, 386.

Of course the legislature in Indiana had authority to adopt the ecclesiastical rule on admissions by a party to a divorce action, and by §37 of Ch. 35 of the Revised Statutes of 1843 it was enacted that, "No sentence of nullity of a marriage shall be pronounced solely on the declarations or confessions of the parties; but the court shall, in all cases, require other satisfactory evidence of the existence of the facts on which the allegation of nullity is founded." "This statute of ours but enacts the canon law rule of evidence upon this question; and the view taken corresponds with the practice in *England* under that law, and also in the several states in this Union in whose Courts the same rule of evidence has, by different modes, been adopted." *M'Culloch* v. *M'Culloch* (1846), 8 Blackf. 60, 62.

Chapter 4 of the 1852 Acts regulated the granting of divorces. Section 13 thereof provided as follows:

"The defendant shall answer said petition under oath if required so to do by the petitioner; but no decree shall be rendered on default without proof; nor shall any admissions made in said answer be used as evidence in any other case against said defendant, nor shall the denial under oath by the defendant of the facts alleged in the petition render necessary any other or further proof by the complainant than would have been necessary if such denial had not been under oath." The annotator in a note thereto called attention to the rule of the Canon law in §37 of Ch. 35 of the 1843

Acts and then stated, "The present statutes, however, change the rule, confessions and admissions, evidently standing on the same footing as in other cases."

In Chapter 43 of the 1873 Acts, §3-1201, *et seq.*, Burns' 1946 Replacement, there is no requirement for corroboration of testimony except that the residence requirements must be proved "by at least two [2] witnesses, who are resident householders of the state." Section 3-1203, Burns' 1946 Replacement. It is obvious that if the General Assembly had intended to readopt the requirements of the Canon law as to confessions or admissions by a party, it would have plainly said so as it did in §37 of Ch. 35 of the 1843 Revised Statutes. It is not within our power to re-enact §37 of Ch. 35 of the 1843 Acts by judicial fiat.

In this state since at least 1858 it has always been the rule that in a civil action, as distinguished from a criminal proceeding, it was only necessary to prove an issue by the fair preponderance of the evidence. "It is undoubtedly true, that in civil cases the preponderance of the evidence should govern the verdict. . . ." *McLees* v. *Felt* (1858), 11 Ind. 218, 221. "The law requires of the party with the burden of the issue that he have simply a preponderance of the evidence, and nothing more of the slightest weight, is required. *Hammond, etc., Electric R. Co.* v. *Antonia* (1908), 41 Ind. App. 335, 343, 83 N. E. 766." *Vivian Collieries Co.* v. *Cahall* (1915), 184 Ind. 473, 492, 110 N. E. 672. ". . . but that preponderance does not, by any means, necessarily depend upon the number of witnesses." *McLees* v. *Felt*, p. 221, *supra*. In a civil action even though the act or omission charged also constitutes a crime, a preponderance of the evidence is sufficient to prevail. *Hale* v. no rule of evidence requiring a greater preponderance *Matthews* (1889), 118 Ind. 527, 21 N. E. 43. There is

of proof in one civil action than another. *Continental Insurance Co.* v. *Jachnichen* (1887), 110 Ind. 59, 62, 10 N. E. 636. In a bastardy case this court, in 1888, decided, "a preponderance of the evidence only is necessary to establish the affirmative of an issue, whatever the nature of that issue may be." *Reynolds* v. *State, ex rel. Cooper* (1888), 115 Ind. 421, 422, 423, 17 N. E. 909. "The general rule in civil cases is, that a party having the burden of an issue shall succeed upon that issue, if he can bring to his aid a preponderance of the evidence. We know of no exception to this rule in this state, except in the case of slander, where the defendant justifies the speaking of words which charge the plaintiff with larceny or some other felony." *Hale* v. *Matthews* (1889), 118 Ind. 527, 530, 21 N. E. 43.[2]

If there is any one rule that is settled beyond question for the guidance of courts of review in considering appeals, it is that neither the Appellate Court nor the Supreme Court will weigh the evidence. Our statute on divorce does not require a different amount of proof for any of the causes for divorce, and many times both courts have stated the evidence will not be weighed on appeal. The following cases conclusively settle the question:

"The appellant also contends that the evidence was insufficient to support appellee's charge of cruel and inhuman treatment by the appellant. While the evidence on this subject was weak and conflicting. . . .

"This court cannot weigh the evidence, and will consider only the evidence most favorable to the appellee."

2. "It is elementary that in civil cases a mere preponderance of the proof is all that is necessary to establish the point in issue . . ." 1 Jones on Evidence (4th Ed.) §5, p. 6.

". . . the testimony of a single witness may suffice to constitute a preponderance; and this is true even though the witness is shown to be interested." 3 Jones on Evidence (4th Ed.) §900, p. 1682.

Swaim, C. J., in *Wharton* v. *Wharton* (1941), 218 Ind. 345, 351, 32 N. E. 2d 695.

"It is the lower court's duty to weigh the evidence, and it is not now this court's duty." Hughes, C. J., in *McMurrey* v. *McMurrey* (1936), 210 Ind. 595, 597, 4 N. E. 2d 540. The same case overruled *Eward* v. *Eward* (1920), 72 Ind. App. 638, 125 N. E. 468, and stated, "Moreover, in the Eward case, there was a clear weighing of the evidence by the Appellate Court, notwithstanding its insistence that it did not, and that it was not its duty to weigh the evidence. . . . In our judgment, the case of *Eward* v. *Eward, supra,* does not state the law correctly, and we disapprove of the same." Pages 598, 599.

"The gravamen of the action was cruel and inhuman treatment and the testimony of appellee alone is amply sufficient, for the court will not weigh the evidence but will affirm the judgment if there was any evidence from which the trial court could reasonably have inferred the ultimate facts necessary to his decision." Richman, J., in *Sostheim* v. *Sostheim* (1941), 218 Ind. 352, 354, 32 N. E. 2d 699.

"The question for decision here is: Is there any evidence to support the judgment? This court cannot weigh conflicting evidence in order to set aside the decision of the trial court." Roby, J., in *Wise* v. *Wise* (1909), 43 Ind. App. 625, 626, 88 N. E. 309.

"Appellee, plaintiff, below, was granted a divorce from appellant. Appellant contends that the finding of the court is not sustained by sufficient evidence.

"The finding rests on conflicting evidence. The judgment is therefore affirmed." McMahan, J., in *Miller* v. *Miller* (1920), 73 Ind. App. 19, 126 N. E. 435.

"Where there is any conflict in the evidence, this

court cannot and will not weigh such evidence." Kime, J., in *Powell* v. *Powell* (1932), 94 Ind. App. 169, 171, 179 N. E. 244.

"Appellant insists that it is the duty of this court to weigh the evidence under §2-3229, Burns' 1933, §467, Baldwin's 1934. That statute, however, does not authorize us to weigh conflicting oral evidence. *State Life Insurance Co.* v. *Cast* (1938), 214 Ind. 17, 13 N. E. (2d) 705; *Parkison* v. *Thompson* (1905), 164 Ind. 609, 73 N. E. 109. If there is some evidence to support the decision, it will not be disturbed. *Dickinson* v. *Dickinson* (1913), 54 Ind. App. 53, 102 N. E. 389." Flanagan, J., in *Ringenberg* v. *Ringenberg* (1942), 110 Ind. App. 290, 292, 38 N. E. 2d 870.

"The case at bar aptly illustrates the wisdom of the rule that this court may not weigh conflicting evidence, but will affirm the judgment if there is any evidence from which the trial court could reasonably have inferred the ultimate facts necessary to its decision, *Sostheim* v. *Sostheim* (1941), 218 Ind. 352, 32 N. E. (2d) 699, for from a reading of the transcript it would be utterly impossible for this court to ascertain the facts and fix the fault as between these parties. Only the trial court who saw and heard them testify is in a position to do so." Draper, J., in *Smiley* v. *Smiley* (1943), 114 Ind. App. 138, 139, 51 N. E. 2d 98.

"There was sufficient evidence to sustain the charge of cruel and inhuman treatment. It is true, as contended by appellant, that where each of the married parties have committed a matrimonial offense which is a cause for divorce, when one seeks this remedy the trial court will not grant either party a divorce. In this case the trial court, by its judgment, presumably determined this condition did not exist. We cannot over-

rule its finding without weighing the evidence. This we are not permitted to do. *Sostheim* v. *Sostheim* (1941), 218 Ind. 352, 32 N. E. (2d) 699." Royse, J., in *Stinson* v. *Stinson* (1947), 117 Ind. App. 661, 662, 74 N. E. 2d 745.

"In this connection it must be borne in mind that the trial judge, as the trier of the facts, was not bound by the testimony of any single witness or any particular item of evidence. It was his exclusive province to judge and determine the credibility of witnesses, weigh the evidence, and determine which of the parties, if either of them, was entitled to a decree of divorce. . . . Upon appeal this court cannot substitute its judgment as to the weight of the evidence for that of the trial court." Hamilton, J., in *McDaniels* v. *McDaniels* (1945), 116 Ind. App. 322, 331, 332, 62 N. E. 2d 876. (Transfer denied December 20, 1945.)

"Most of this evidence is vigorously disputed and appellant offers much testimony in explanation of her conduct and in support of charges in her cross-complaint. This testimony, however, the trial court saw fit to reject, which was strictly within its province to do and outside ours to disturb, and we cannot say, as a matter of law, that the evidence in support of the court's decision, as we have briefly reviewed it above, fails to show cruel and inhuman treatment." Crumpacker, J., in *Mendenhall* v. *Mendenhall* (1946), 116 Ind. App. 545, 554, 64 N. E. 2d 806. (Transfer denied April 4, 1946.)

"It must be remembered that it was the exclusive province of the trial court, as the trier of the facts, to determine the weight of the evidence and the credibility of the witnesses as they appeared and testified before him, and, after a careful consideration of all the evidence, we cannot say that the allowance was erroneous."

Hamilton, C. J., in *Adams* v. *Adams* (1946), 117 Ind. App. 335, 337, 338, 69 N. E. 2d 632. (Transfer denied April 2, 1947.)

"We cannot say, without weighing the evidence and substituting our judgment for that of the trial court, that these issues were decided erroneously. That, of course, we are not permitted to do." Crumpacker, J., in *Waid* v. *Waid* (1946), 117 Ind. App. 4, 8, 66 N. E. 2d 907.

The law as to admissions by a party is equally well settled. "The admissions of a party are evidence against him, whether made in connection with an act done or not." *Denman* v. *McMahin, Adm'r.* (1871), 37 Ind. 241, 244. " 'But where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature;'." *Hill* v. *Newman* (1874), 47 Ind. 187, 195, approved in *Pence, Adm.* v. *Makepeace* (1879), 65 Ind. 345, 365. "Where a party makes admissions they are accepted as original evidence, upon the ground that the admissions of a party against his interest are made because they truthfully embody the facts, and they are, therefore, substantive proof of the facts admitted." *Logansport and Pleasant Grove Turnpike Company* v. *Heil* (1889), 118 Ind. 135, 136, 20 N. E. 703.

It has never been the law in Indiana in civil cases that proof of the corpus delicti must be made before admissions of a party became relevant or competent. It would be strange law if a defendant in a criminal prosecution could receive the death sentence on his admissions or confessions, while in a civil action, which only requires a preponderance of the evidence, admissions of a party would not sustain a finding or a verdict. Even in criminal prosecutions there is no rule

requiring corroboration for a confession, unless it was given under inducement. Section 9-1607, Burns' 1942 Replacement.

When adultery is charged in an action for divorce we would hardly expect the record to disclose the parties went to some public place to gratify their illicit affection, or were careless when seeking to avoid detection. "As the offense is almost invariably clandestine and committed only when every precaution has been taken to preclude the possibility of discovery, and as it is very rarely indeed that the parties are surprised in the direct act of adultery, all the circumstances should be carefully considered, and what would be evidence in one case might not be in another. A preponderance of evidence is all that is required." Keezer, Marriage and Divorce (3rd Ed.), §311, pp. 383, 384. "Circumstantial evidence may suffice to show the offense. Indeed, that is usually the only kind of evidence available, as misconduct of this kind is usually clandestine and secret." 1 Nelson, Divorce and Annulment (2d Ed.), §5.10, p. 187. This court in *Jackson* v. *State* (1888), 116 Ind. 464, 465, 19 N. E. 330, recognized that convictions must often rest only on circumstantial evidence and said, "From the very nature of the case, it will rarely happen that direct and positive evidence of acts of illicit intercourse can be obtained. Accordingly, the unlawful and lascivious commerce may be inferred from circumstances proven, which raise such a presumption of guilt, as leaves no reasonable doubt, in that regard, in the minds of the jury." It should be borne in mind the court was there talking about criminal adultery under §10-4207, Burns' 1942 Replacement, which requires proof of an adulterous cohabitation. Proof of cohabitation in adultery is not required for divorces under §3-1201, Burns' 1946 Replacement, any

more than the Seventh Commandment condemns adulterous cohabitation rather than a single act.[3]

No doubt the eminent trial judge, when he was weighing the evidence, had in mind, as stated by the Supreme Court of Kentucky in *Yeary* v. *Yeary* (1930), 233 Ky. 691, 694, 26 S. W. 2d 536, ". . . we are dealing with the strongest appetite in the human body, for the gratification of which more foolish things have been done and greater risks taken than all other appetites combined."

When the evidence is viewed most favorably to the appellee, as has been the uniform and consistent practice of both the Appellate Court and this court, the trial court as the trier of the facts had ample evidence before it to find as follows:

Appellee was a duly qualified and licensed physician and surgeon, who had been practicing at West Lebanon, Indiana, for five years. He was 33 years old at the time of the trial, born at Martinton, Illinois, and had attended the common schools in Illinois. After being graduated from high school he worked for a year at Gibson City, and then entered Bradley Polytechnic Institute, Peoria, Illinois, where he was graduated in June, 1941, with an A.B. degree. Then he entered the University of Illinois College of Medicine at Chicago, where, after completion of his second year, he received a Bachelor of Science degree. In December, 1944, he received a Doctor of Medicine degree from the same University. Then he served a nine-months internship at Mt. Carmel Mercy Hospital at Detroit. In October, 1945, he entered the active service of the

3. In prosecutions under §10-4217, Burns' 1942 Replacement, for keeping a house of ill fame, the State can introduce evidence of general reputation and conviction may be had without proving specific acts of prostitution. *Betts* v. *State* (1884), 93 Ind. 375; *Schultz* v. *State* (1928), 200 Ind. 1, 161 N. E. 5.

Medical Corps of the armed forces, and served as an officer until July, 1947, during which time he spent more than a year in Japan. He was discharged with the rank of Captain. He took the Illinois State medical examination in October, 1947, and accepted a residency at Tuscon Medical Center in Arizona. On February 1, 1948, he opened his office for the practice of medicine in West Lebanon, Indiana. His father gave him substantial financial aid to complete his education, and he also received assistance from the federal government under an army training program.

The parties were married April 22, 1943, and a son was born to them May 30, 1946, while the doctor was in Tokyo. The parties lived in an apartment over the Post Office in that village and the doctor's office was in another building. While at West Lebanon they became acquainted with a number of young married couples in the community, including a Mr. and Mrs. Switzer, who resided in Illinois.

The parties did some entertaining in their apartment and were entertained by others of the community. At a New Year's Eve party in their apartment, December 31, 1950, the doctor went to a closet to get some phonograph records. The closet was dark, and when he opened the door he found his wife and Switzer therein embracing each other. In the spring of 1951 he told his wife that one Ann Byers had told him that the two were seeing one another. The wife became indignant, took the doctor's car and disappeared for about three hours. Upon returning she said she had been out driving.

Appellant had inherited an interest in some real estate near Ashtabula, Ohio, and on Saturday, September 1, 1951, the parties and the Switzers drove in the doctor's automobile to Ashtabula to view the property.

They arrived at about 7:00 P.M., and were not able to secure lodging at a hotel, but took separate rooms in a motel. They purchased some wine and had a few drinks before and after dinner. After dinner the doctor and the appellant had an argument about her scanty attire causing an indecent exposure of her person while they were playing cards with the Switzers. After 11:00 o'clock that night they drove about two miles to an Elks Club on Lake Erie. Switzer and the doctor remained at the foot of the steps at the Elks Club, and the two women went down to the lake where they remained ten or fifteen minutes. Switzer, while his inhibitions were lowered by the effect of his drinking, told the doctor that he had had sexual relations with appellant, that it had been on his conscience, and he wanted to get it off his chest. The women came back to the car and appellant, in an apparent effort to sober up, had permitted herself to be soaked by the spray from the waves. On the way back in the car she took off her dress in the back seat and held it out the window to dry. She was not able to hold her dress and, with the key to the motel room in her skirt pocket, it flew away and was permanently lost. When they got back to the motel Switzer suggested that they bow their heads for prayer, and he prayed for forgivenness for past sins. Appellant went to the Switzer room in the motel and slept on the bed with Mrs. Switzer, but Mr. Switzer slept on the floor. The doctor drove around for some time trying to find the lost skirt, came back to the motel, and slept in the car until about 7:00 A.M., when the operator of the motel let him in his own room. Mrs. Nelson came in early that morning and changed her clothes, and then went out with the Switzers to view her property. The doctor stayed in bed until noon. That afternoon they drove back to

West Lebanon and arrived there late Sunday night. The next morning the doctor made his professional calls and spent the afternoon and evening in his office and making other calls. After 9:00 o'clock that night he returned to the apartment and the doctor told appellant what Switzer had confessed. Appellant told him that while Mrs. Switzer was with their child at a camp for diabetic children in Michigan, he called her from his farm, that she had taken the son and gone to the Switzer home, where she made arrangements with him to meet at the Piggly Wiggly store in Danville, after she had taken the boy to her mother's home in that city; that they had gone together from the Piggly Wiggly store back to Switzer's home where they had sexual intercourse. She said it was a "disappointing adventure." The doctor then took his clothes, separated from appellant, and stayed that night with his father in Danville. Since then he has been living in his office.

When the divorce action was pending, the doctor and his wife met at his father's home in Danville, after he had filed a second paragraph of complaint charging adultery. Appellant "said it would never work; she said all she had to do was to say that she told me that to arouse more interest in her." She did not deny the act, but said "that she at least had an excuse." She further stated "her intentions were that she wasn't going to give me a divorce unless it could be on her own terms and . . . she said that she was going to get everything out of me that she could. . . . that she was going to take care of the situation in her own way, on her own terms; that she wasn't going to be left financially stranded."

When appellant was a witness she did not say she denied the act when the doctor related the conversation he had with Switzer, but her testimony as to that

conversation was, "He came in and said that Frank Switzer had told him about, while we were in Ohio, that he and I had had relations; I was very shocked and I don't know whether I said anything or not right at first, but I said, I asked him, 'do you believe it?' and he said 'Yes.' . . . I think I said, 'I am going to bed.' I went to bed; there was very little said that night."

This story of domestic tragedy has none of the earmarks of fabrication or perjury. The trial judge saw and heard the witnesses and was the sole judge of their credibility. This was no collusive action for divorce; it was actively resisted by appellant and her counsel. It was not required under the law that appellee prove repeated acts of adultery or cohabitation in adultery any more than the Seventh Commandment condemns only cohabitation in adultery.

Nor can we agree with appellant's strange contention that "one single act of cruel and inhuman treatment is not sufficient proof thereof to justify a decree of divorce." In the leading case of *Eastes* v. *Eastes* (1881), 79 Ind. 363, this court held that "failure of the husband" to make reasonable provision for his family, which was a separate cause for divorce, could also constitute "cruel and inhuman treatment." "Cruel and inhuman treatment includes mental as well as physical cruelty. *Dickinson* v. *Dickinson, supra* [(1913), 54 Ind. App. 53, 102 N. E. 389]." *Ringenberg* v. *Ringenberg* (1942), 110 Ind. App. 290, 293, 38 N. E. 2d 870, *supra*. If one admission of adultery is excusable, how many admissions would it take before cause for divorce be established?

Under Ch. 208 of the 1935 Acts, §2-508, Burns' 1946 Replacement, appellee was prohibited in the first instance from naming the correspondent in his complaint. The action for divorce was commenced September 10,

1951. On May 28, 1952, the appellant for the first time filed a motion to make more specific and a motion for a bill of particulars. This motion for a bill of particulars does not appear in the record, since the record discloses that it was withdrawn from the files on September 11, 1952, upon a motion filed by appellant. On May 15, 1952, appellee filed his second paragraph of complaint which specifically charged adultery on a certain date with a man whose identity he would allege if required by order of court. Appellant by her own testimony admits appellee had charged her specifically with adultery at the time of the separation, and it is inconceivable that her counsel were not fully advised as to this conversation, which was the immediate cause of the separation.

On October 28, 1952, the cause was submitted to the court for trial, finding and judgment without the intervention of a jury, and evidence was heard in part. Further trial was had on November 13th. The hearing of evidence was concluded and the cause argued on November 14, 1952. On November 29, 1952, appellant filed a motion to reopen the cause to hear the evidence of Frank Switzer. This verified motion was overruled December 15, 1952, at which time the court announced and entered a finding and judgment for appellee granting him the divorce. The verified motion stated that Switzer had returned from foreign service with the Army on November 18, 1952, and the motion was filed "as soon thereafter as defendant's counsel could talk with said witness." The motion further stated that if he were a witness he would deny the adultery or that he told appellee he had committed adultery.

It was within the discretion of the trial court to overrule a motion to reopen the case to hear further evidence, and no abuse of that discretion is shown by

this record. It must always be remembered that Switzer was a resident of Illinois and in any event could not be compelled to testify as a witness except by deposition. No excuse is shown why for at least eleven months appellant made no effort to take Switzer's deposition, or that it would have been impossible to take his deposition by any statutory means while he was in the armed forces. This court judicially knows men in the armed forces can be reached by mail wherever they may be located throughout the world.

The trial judge had the right to infer appellant did not want to sponsor Switzer as a witness until they were sure he would deny the adultery. Mrs. Switzer was a witness for appellant, and she only testified she had received a letter from her husband in Korea that he was returning soon. If he could not be reached by letter while he was in the Army, she would have so testified. It is significant that at the time she testified, counsel for appellant did not request that further trial of the cause be continued until after the return of Switzer to this country so that he could appear and testify or give a deposition.

Denials of adultery by the paramour are to be expected. 1 Nelson, Divorce and Annulment, §5.13, p. 191. If the cause had been reopened for further evidence, Switzer's testimony would have been merely cumulative. The requirements for granting such a motion are the requirements for granting a new trial because of newly discovered evidence. "No reason exists for applying to this case a rule differing from that prevailing as to motions for a new trial as we have stated it, and, if the proposed evidence was competent, it should have suggested itself to the appellant at the trial. The presumption against diligence was not overcome, and the court did not err in denying

the motion." *Working* v. *Garn* (1897), 148 Ind. 546, 550, 47 N. E. 951. 3 Lowe's, Works' Indiana Practice, §52.24, p. 269, and cases therein cited; Flanagan, Wiltrout and Hamilton, Indiana Trial and Appellate Practice, §1964, p. 475.[4] This record shows no diligence to compel Switzer to testify, and even if the motion had been granted there was nothing to prevent Switzer from changing his mind and refusing to appear in an Indiana court.

It is not the duty of this court to moralize on divorce, or the problems of infidelity which have concerned monogamous society for centuries. We have no jurisdiction nor are we competent to sit in moral judgment on an aggrieved spouse, and dictate whether infidelity shall be condoned or result in a severance of marriage. It is sufficient for this court to follow the legislative policy of this jurisdiction, which since 1795 has made adultery a cause for divorce. We do not sit to deny legal rights, or to limit them to those who have sufficient funds to employ detectives and investigators to obtain corroborating evidence. The finding was sustained by sufficient evidence and was not contrary to law.

Chief Justice Flanagan and I would affirm the judgment. My Brothers Draper, Bobbitt and Gilkison are of the opinion the trial court committed reversible error when it overruled appellant's motion to reopen the case to hear the testimony of Switzer. Therefore, the judgment is reversed and a new trial ordered.

NOTE.—Reported in 121 N. E. 2d 883.

---

4. "The overruling of a motion to reopen a case is not error where the further evidence would be merely cumulative and diligence was not shown to obtain it. *Foster* v. *Malsbary* (1927), 86 Ind. App. 411, 157 N. E. 446." Flanagan, Wiltrout and Hamilton, Indiana Trial and Appellate Practice §1964, p. 475.